IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


COLUMBIA SPORTSWEAR NORTH
AMERICA, INC., an Oregon corporation,

        Plaintiff,

    v.

SEIRUS INNOVATIVE ACCESSORIES,
a Utah corporation,

        Defendant.

No. 3:15-cv-00064-HZ

OPINION & ORDER


Nicholas F. Aldrich, Jr.
David W. Axelrod
Scott D. Eads
Schwabe Williamson & Wyatt, PC
1211 SW Fifth Avenue, Ste. 1600
Portland, OR 97204

     Attorneys for Plaintiff


OPINION & ORDER - 1

Eric M. Jaegers
Troutman Sanders LLP
11682 El Camino Real, Ste. 400
San Diego, CA 92130

Matthew D. Murphey
Troutman Sanders LLP
5 Park Plaza , Ste. 1400
Irvine, CA 92614

Alison A. Grounds
Paul E. McGowan
Troutman Sanders LLP
600 Peachtree St. NE, Ste. 5200
Atlanta, GA 30308

Anup M. Shah
Troutman Sanders LLP
301 S. College St., Ste. 3400
Charlotte, NC 28202

Jasmine C. Hites
Troutman Sanders LLC
100 SW Main, Ste. 1000
Portland, OR 97204

Attorneys for Defendant

HERNÁNDEZ, District Judge:

Plaintiff Columbia Sportswear North America, Inc. ("Columbia"), alleges that Defendant Seirus Innovative Accessories, Inc. ("Seirus"), has infringed three of Columbia's patents related to a heat reflective lining for outdoor sporting gear, U.S. Patent Nos. 8,424,119 (the '119 Patent), 8,453,270 (the '270 Patent), and D657,093 (the 'D093 patent). On January 15, 2016, the parties submitted a Joint Claim Construction chart identifying a number of disputed terms or phrases. The parties then simultaneously filed opening claim construction briefs and responsive memoranda. The Court held oral argument on May 27, 2016. Based on the parties' evidence, memoranda, and oral argument, the Court construes the disputed terms below.

OPINION & ORDER - 2

CLAIM CONSTRUCTION STANDARDS

Patent infringement analysis involves two steps. First, the court construes the asserted patent claims. Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc). Second, the factfinder determines whether the accused product or method infringes the asserted claim as construed. Id. The first step, claim construction, is a matter of law "exclusively within the province of the court." Markman v. Westview Instruments, Inc., 517 U.S. 370, 372 (1996); Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quotation omitted). Patent claims must precisely define the relevant invention to put both the public and competitors on notice of the claimed invention. See id.

To construe a patent claim, courts first look to the language of the claims in the patent itself, the description in the patent's specification, and the patent's prosecution history, all of which constitute a record "on which the public is entitled to rely." Vitronics, 90 F.3d at 1583; Dow Chem. Co. v. Sumitomo Chem. Co., 257 F.3d 1364, 1372 (Fed. Cir. 2001). In most cases, the court should be able to resolve ambiguous claim terms by analyzing this intrinsic evidence. See Phillips, 415 F.3d at 1313–14. The court considers extrinsic evidence only if the intrinsic evidence is insufficient to resolve the ambiguity of a term. Vitronics, 90 F.3d at 1586.

"The actual words of the claim are the controlling focus." Digital Biometrics, Inc. v. Identix, Inc., 149 F.3d 1335, 1344 (Fed. Cir. 1998). "[T]he words of the a claim are generally given their ordinary and customary meaning." Phillips, 415 F.3d at 1312 (quotation omitted). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the

OPINION & ORDER - 3

effective filing date of the patent application." Id. at 1313. There is a "heavy presumption" that a claim term carries its ordinary and customary meaning, and a party seeking to convince a court that a term has some other meaning "must, at the very least," point to statements in the written description that "affect the patent's scope." Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 989 (Fed. Cir. 1999) (quotation marks omitted). This may be accomplished if: (1) "a different meaning is clearly and deliberately set forth in the intrinsic materials" of the patent or (2) use of "the ordinary and accustomed meaning . . . would deprive the claim of clarity . . . ." K-2 Corp. v. Salomon S.A., 191 F.3d 1356, 1363 (Fed. Cir. 1999). In making this assessment, the court should use common sense and "the understanding of those of ordinary skill in the art" of the patent at issue, unless the patent history supplies another meaning. Id. at 1365; Digital Biometrics, 149 F.3d at 1344.

Beyond the plain language of the claims, the patent specification is always highly relevant and often dispositive to the proper construction. Vitronics, 90 F.3d at 1582 (explaining that the specification is "the single best guide to the meaning of a disputed term."). The purpose of the patent specification is to teach and enable those skilled in the art to make and use the invention, along with the best method for doing so. Cyber Acoustics, LLC v. Belkin Int'l., Inc., No. 3:13–cv–01144–SI, 2014 WL 1225198 (D. Or. Mar. 24, 2014). The inventor can use the specification to describe the invention in a number of ways, such as describing different "embodiments" of the invention and by assigning particular meanings to specific claim language. Metabolite Lab., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1360 (Fed. Cir. 2004); Phillips, 415 F.3d at 1316. The embodiments serve as illustrative examples of the invention claimed. Phillips, 415 F.3d at 1323 ("One of the best ways to teach a person of ordinary skill in the art how to make and use the invention is to provide an example of how to practice the

invention in a particular case."). The inventor can also clarify that he or she intends the claim language to carry a specific meaning different from its ordinary one. Id. In these cases, "the inventor's lexicography governs." Id. at 1316.

Finally, the prosecution history, which contains the record of the proceedings before the Patent and Trademark Office, informs the analysis into what a person skilled in the art would understand the term to mean. Vitronics, 90 F.3d. at 1582–83. The prosecution history becomes useful where it "provides evidence of how the PTO and the inventor understood the patent." Phillips, 415 F.3d at 1317. However, this evidence is less valuable because it represents an "ongoing negotiation" between the inventor and the PTO. Id. The final result of that negotiation, the patent itself, provides better evidence of the claim's intended meanings at the time the patent issued. Id.; see also Hangartner v. Intel Corp., No. 3:14-CV-00141-MO, 2014 WL 7228992, at *2 (D. Or. Dec. 17, 2014).

DISCUSSION

I.    Background & Overview of Patents

Columbia's patents asserted here relate to heat reflective fabrics used in body gear— athletic or performance clothing a person might wear while, for example, skiing in the Cascade Mountains, trail running, or even walking the dog. Prior to the invention, it was well-known that high performance fabrics like polyester could be incorporated into body gear to increase breathability and moisture wicking capabilities. It was also known that thin reflective material, such as a mylar space blanket, could reflect body heat back to the wearer to increase warmth without adding bulk. But merely lining a jacket made of high performance material with a sheet of mylar is not desirable because the jacket would lose its breathability and moisture wicking

capabilities, and the wearer would inevitably become clammy and uncomfortable. Moreover, the

mylar sheeting would not stretch or drape in the same way the fabric would.

The patented technology addresses those problems by affixing reflective elements to the

base fabric using only partial coverage in a certain ratio. Specifically, the inventor found that if

between 30 percent and 70 percent of the base fabric was exposed between the heat reflective

elements, the resulting fabric would effectively reflect heat while preserving the moisture-

wicking or other desired properties of the base fabric. This patented invention formed the basis

of Columbia's "Omni Heat" line of products. The abstracts describe the invention as follows:

> Embodiments of the present disclosure relate generally to body gear having
> designed performance characteristics, and in particular to methods and
> apparatuses that utilize an array of heat managing elements coupled to a base
> material to direct body heat while also maintaining the desired transfer properties
> of the base material. In some embodiments, the heat managing material elements
> include heat management elements that reflect heat or conduct heat, and may be
> directed towards the body of a user or away from the body of the user.

'119 patent, col. 1, ll. 25–31; '270 patent, col. 1, ll. 25–31.

Seirus sells its own brand of outdoor gear with a breathable, heat reflective material it

calls "HeatWave." Columbia alleges that Seirus's HeatWave line of products infringes on three

of Columbia's patents—the '119 and '270 patents (collectively the "utility patents"), and the

'D093 patent. The '119 is a continuation application of the '270 patent, so the patents share an

abstract, background, and specifications. Aldrich Decl. Exs. A and B, ECF 74-1. Both utility

patents are titled "Patterned Heat Management Material." The 'D093 patent is a design patent

entitled "Heat Reflective Material" which claims "the ornamental design of a heat reflective

material" and depicts the following pattern:

OPINION & ORDER - 6

 

'D093 patent; Aldrich Decl. Ex. C, ECF 74-1.

Columbia asserts that Seirus infringes the following claims:

- Claims 2, 16, and 23 of the '119 patent;
- Claims 2, and 23 of the '270 patent;
- Claim 1 of the 'D0093 patent.

Joint Claim Construction and Prehearing Statement at 2, ECF 67 ("Joint Statement").[1] Claim 1 of

the '119 patent recites:

1. A heat management material adapted for use with body gear, comprising:

   a base material having a transfer property that is adapted to allow, impede, and/or restrict passage of a natural element through the base material;

   one or more heat-directing elements, each coupled to a first side of a base material, the one or more heat-directing elements being positioned to direct heat in a desired direction, wherein a surface area ratio of heat-directing elements to base material is from about 7:3 to about 3:7, and wherein the surface area ratio of heat-directing elements to base material permits the base material to retain partial performance of the transfer property.

---

[1] Although Columbia originally asserted that Seirus infringed Claim 22 of both the '119 and '270 patents, during the Markman briefing, Columbia amended its infringement contentions and withdrew claim 22 of both patents. Pl. Resp. at 1, ECF 87.

'119 patent, col. 8, ll. 10–22. Claim 2 of the '119 patent, which depends from claim 1, adds that the heat-directing elements are on the "innermost surface" of the "innermost layer of the body gear":

> 2. The heat management material of claim 1, wherein the base material comprises an innermost layer of the body gear having an innermost surface, and wherein the one or more heat-directing elements are positioned on the innermost surface to direct heat towards the body of a body gear user.

'119 patent, col. 8, ll. 23–27.

Claim 15 and 16 of the '119 patent are method claims and recite:

> 15. A method of making a heat management body gear material, comprising:
>
> coupling one or more heat-directing elements to a first side of a base material having a transfer functionality that is adapted to allow, impede, and/or restrict passage of a natural element through the base material, the one or more heat-directing elements being positioned to direct heat in a desired direction, wherein coupling the one or more heat-directing elements comprises coupling one or more heat-directing elements of a size and spacing to cover from about 30% to about 70% of the base material;
>
> pairing the heat management body gear material with a piece of body gear;
>
> providing, with the material, body heat management and base material functionality.
>
> 16. The method of claim 15, wherein the base material further provides insulating properties, and wherein the one or more heat-directing elements reflect heat toward a body of a user.

'119 patent, col. 8, ll. 66–67; col 9, ll. 1–16.

Claims 20 and 23 of the '119 patent recite:

> 20. A heat management material adapted for use with body gear, comprising:
>
> a base material having one or more properties of breathability, moisture vapor permeability, air permeability, or moisture wicking;

OPINION & ORDER - 8

one or more heat-reflective elements, wherein each of the one or more heat-reflective elements is coupled to a first side of the base material, the one or more heat-reflective elements being positioned to reflect heat in a desired direction;

wherein a surface area ratio of heat-directing elements to base material is from about 7:3 to about 3:7, and wherein the surface area ratio of heat-directing elements to base material preserves partial performance of the one or more properties of the base material.
. . .

23. The heat-management material of claim 20, wherein portions of the base material are exposed and not covered by the one or more heat-directing elements.

'119 patent, col. 10, ll. 1–26.

The asserted claims from the '270 patent are similar to those in the '119 patent, except the '270 patent claims a "discontinuous array of discrete heat-directing elements":

1. A heat management material adapted for use with body gear, comprising:

a base material having a transfer property that is adapted to allow, impede, and/or restrict passage of a natural element through the base material;

and a discontinuous array of discrete heat-directing elements, each independently coupled to a first side of a base material, the heat directing elements being positioned to direct heat in a desired direction, wherein a surface area ratio of heat-directing elements to base material is from about 7:3 to about 3:7 and wherein the placement and spacing of the heat-directing elements permits the base material to retain partial performance of the transfer property.

2. The heat management material of claim 1, wherein the base material comprises an innermost layer of the body gear having an innermost surface, and wherein the heat-directing elements are positioned on the innermost surface to direct heat towards the body of a body gear user.

'270 patent, col. 8, ll. 8–26.

OPINION & ORDER - 9

Claim 23 of the '270 patent recites:

23. A heat management material adapted for use with body gear, comprising:

a base material having a transfer property that is adapted to allow, impede, and/or restrict passage of a natural element through the base material;

and a discontinuous array of heat-directing elements, each coupled to a first side of a base material, the heat directing elements being positioned to direct heat in a desired direction, wherein a surface area ratio of heat-directing elements to base material is from about 7:3 to about 3:7, and wherein the placement and spacing of the heat-directing elements permits the base material to retain partial performance of the transfer property,

wherein the base material comprises an innermost layer of the body gear having an innermost surface, and wherein the heat-directing elements are positioned on the innermost surface to direct heat towards the body of a body gear user.

'270 patent, col. 9, ll. 26–30; col. 10, ll. 1–14.

II.    Claim Construction

The parties agree on the construction of the following four claim terms or phrases:

- "surface area ratio of heat-directing elements to base material" means "the amount of surface area of a side of the base material that is covered by the heat directing elements divided by the total surface area of the side of the base material onto which the elements are attached." '119 Patent, Claim 2, 16, 23; '270 Patent, Claim 2, 23.

- "pairing the heat management body gear material with a piece of body gear" means "using the heat management material with other components to form a piece of body gear. " '119 Patent, Claim 16.

- "uniformly-sized" means "the same size." '270 Patent, Claim 22.

- "heat" means "heat seen as a form of energy that may be transferred by conduction, convection or radiation." '119 Patent, Claims 2, 16, 23; '270 Patent, Claims 2, 23.

Joint Statement at 2–3.

OPINION & ORDER - 10

The parties submitted a number of disputed terms for the Court to construe, which can be organized into the following categories:

- "Adapted" terms;
- "Heat Management" terms;
- "Heat Directing" or "Heat Reflecting" terms;
- "Discontinuous Array";
- Construction of Design Patent 'D093.

Each category is addressed below.

    a.   "Adapted" terms

The parties seek construction of the terms "adapted to" or "adapted for." '119 patent, claims 2, 16, 23; '270 patent, claims 2, 23. Further, the parties ask for a construction of those terms as they appear in specific claims: "adapted for use with body gear," '119 patent, claims 2, 23; '270 patent claims 2, 23, and "adapted to allow, impede, and/or restrict passage." '119 patent, claims 2, 16; '270 patent, claims 2, 23. Seirus asserts that "adapted to" or "adapted for" should be construed as the broader concept of "capable of," or as a specific example, "[something that is] capable of being incorporated into body gear." Joint Statement at 3–4. Columbia proposes a narrower construction of "suited by design for," or "suited by designed for use with body gear." Id.

"[T]he phrase 'adapted to' is frequently used to mean 'made to,' 'designed to,' or 'configured to,' but it can also be used in a broader sense to mean 'capable of' or 'suitable for.'" Aspex Eyewear, Inc. v. Marchon Eyewear, Inc., 672 F.3d 1335, 1349 (Fed. Cir. 2012). The way "adapted to" or "adapted for" is used in the '119 and the '270 patents supports the narrower construction of "suited by design to" or "suited by design for."

The '119 and '270 patents disclose a specially designed fabric that combines a base fabric specifically chosen for its properties (whether moisture wicking, drape, or the like) with a

OPINION & ORDER - 11

heat reflective material to create a new fabric that combines the desired properties of both component materials. See '119 col. 1, ll. 23–28 (disclosing "a fabric . . . used for body gear . . . having designed performance characteristics," specifically combining a "pattern of heat management/directing elements" with a "base fabric to manage heat . . . while maintaining the desired properties of the base fabric."). It is not, as Serius's proposed construction would suggest, a happy accident that the invention is "capable" of both directing heat and being incorporated into body gear. If that were true, then the patent would potentially claim the very problem it purported to solve. As the patents explain, a sheet of heat reflective materials such as aluminum and mylar, though *capable of* being incorporated into body gear, is not *suited by design* for such a purpose because it would "impede[] the breathability and other functions of the underlying base fabric," and actually "accelerat[e] heat loss due to the increased heat conductivity inherent in wet materials." '270 Patent, col. 1, ll. 40–45. The proper understanding of "adapted for" or "adapted to" in the asserted patents does not incorporate the broader sense of mere capability.

Accordingly, the Court construes the terms as follows:

- "adapted to" or "adapted for" means "suited by design to" or "suited by design for";
- "adapted for use with body gear" means "suited by design for use with body gear";
- "adapted to allow, impede, and/or restrict passage" means "suited by design to allow, impede, and/or restrict passage."

b. "Heat Management" terms

The parties also seek construction of the terms "heat management material," 119 patent, claims 2, 23; '270 patent, claims 2, 23, "heat management body gear material," 119 patent, claims 16, and "body heat management." 119 patent, claims 2, 16, 23; '270 patent, claims 2, 23.

OPINION & ORDER - 12

Seirus asserts that the Court should construe the "heat management" terms as encompassing the mere "ability to affect the loss or increase of heat." Joint Statement at 3. Columbia argues that Seirus's proposed construction improperly writes mere "capability" into the claims and counters with a more narrow construction of a "textile material designed to direct heat." Id.

The Court declines to further construe the term "management" because a person of ordinary skill in the art would understand the term to have a plain and ordinary meaning, and nothing in the specification indicates the term has any other meaning. The concept of "directing heat," as Columbia proposes, is adequately captured by other language in the claims. See '119 patent, col. 10, ll. 1–10 (reciting "[a] heat management material . . . comprising: a base material . . . [and] one or more heat-reflective elements . . . positioned to reflect heat in a desired direction."). And Seirus's attempt to import the broad concept of mere "capability" is not supported by a reading of the patents' claims in context. Further construction of "management" simply is not necessary as the meaning of the term is apparent by reading the claims and specification. Encap LLC v. Oldcastle Retail Inc., No. 11-C-808, 2012 WL 2339095, at *9 (E.D. Wis. June 19, 2012) ("Claim construction is not intended to allow for needless substitution of more complicated language for terms easily understood by a lay jury.").

  c. "Heat Directing" or "Reflecting" Elements

The parties ask the Court to construe the following terms: "heat directing elements," '119 patent, claims 2, 16, 23; '270 patent, claims 2, 23, "direct heat," '119 patent, claims 2, 16, 23; '270 patent, claims 2, 23, "heat-reflective elements," '119 patent, claim 23, and "reflect heat," '119 patent, claim 23; '270 patent, claim 23. Columbia offers constructions where "direct" or "reflect" essentially means to "alter the direction" of heat. Joint Statement at 4. The only

differences between parties' proposed constructions is that Seirus again attempts to insert the concept of "capability" and also asserts that "heat" should be construed as "heat flow." <u>Id.</u>

For the same reasons stated previously, the Court declines to construe these terms to include the concept of capability. The patents, when read in context, do not support such a broad reading. Secondly, the Court declines to further construe the word "heat," because offering a more complex definition of such a simple and well-understood concept would not be helpful to the jury. <u>Encap LLC</u>, 2012 WL 2339095 at *9.

Accordingly, the Court construes the terms as follows:

- "direct heat" means "alter the direction of heat;"
- "heat-directing elements" means "elements that alter the direction of heat;"
- "reflect heat" means "alter the direction of heat by reflection;" and
- "heat-reflecting elements" means "elements that alter the direction of heat by reflection."

d.  "Discontinuous Array"

The parties seek construction of the terms "discontinuous array" and "discontinuous array of uniformly-sized heat reflective elements." '270 patent, claims 2, 23. Seirus proposes the terms be construed as a "set of [something] that are not connected (i.e. do not touch), and further asserts that "uniformly-sized" should be construed as meaning "are all the same size." Joint Statement at 5. Columbia proposes that "discontinuous array" should be construed as "an arrangement of multiple, discrete elements, whereby some of the base fabric is exposed between adjacent elements," and that further construction of "uniformly-sized" is not necessary. <u>Id.</u>

Seirus's construction purports to rely on the "plain and ordinary meaning of the term." Def. Brief at 25, ECF 70. Columbia relies on the patent's specification to support its proposed construction. The specification describes the invention and provides some further clarification about the arrangement of the heat-directing elements:

OPINION & ORDER - 14

> In various embodiments a material for body gear is disclosed that may use a pattern of heat management material elements coupled to a base fabric to manage, for example, body heat by directing the heat towards or away from the body as desired, while still maintaining the desired transfer properties of the base fabric.
>
> For example . . . in one embodiment, a plurality of heat management or heat directing elements . . . may be disposed on a base fabric . . **.** *in a generally non-continuous array, whereby some of the base fabric is exposed between adjacent heat management elements*. The heat directing function of the heat management elements may be generally towards the body through reflectivity or away from the body through conduction and/or radiation or other heat transfer property.

'270 patent, col. 3, ll. 27–40 (emphasis added). Columbia also provided a portion of the patent's prosecution history to support its proposed construction. As initially filed, the '270 patent recited an "array," but did not include the term "continuous." The examiner rejected claim 1 of the '270 patent because a prior patent anticipated an "array of heat directing elements" that were "coupled" to a base material. Aldrich Decl. Ex. G at 2–3, ECF 74-2. In response, the applicant amended claim 1 to recite "a discontinuous array" of heat directing elements, and explained the distinction:

> The [prior patent] fails to teach or suggest "a discontinuous array of discrete heat-directing elements, each independently coupled to a first side of a base material," . . . . Rather, the [prior] patent teaches a continuous, laminated, reflective sheet that is perforated with fiber wadding. Thus, the laminated sheet provides a continuous, perforated surface, rather than a discontinuous array of discrete heat-directing elements that allow the base material to retain its desired properties. . . . The laminated sheets of the [prior] patent cannot provide the breathability, drape, stretch, etc. afforded by the discrete elements of the claimed invention.

Aldrich Decl. Ex. H at 8–9.

The specification's description of the "discontinuous array" is particularly convincing evidence of the term's meaning. <u>Trustees of Columbia Univ. in City of New York v. Symantec Corp.</u>, 811 F.3d 1359, 1364 (Fed. Cir. 2016) ("a claim term may be clearly redefined without an

explicit statement of redefinition and even when guidance is not provided in explicit definitional format, the specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents.") (citation and quotation marks omitted).

Based on the claim language, specification, and prosecution history, the Court adopts Columbia's proposed construction:

- "discontinuous array" means "an arrangement of multiple, [discrete heat-directing elements], whereby some of the base fabric is exposed between adjacent elements."

The bracketed terms are not part of the Court's construction of the term, but are simply offered to provide context for the construed term as it is inserted into the claims.

Finally, the Court notes that "uniformly sized" only appears in Claim 22, and Columbia has withdrawn its infringement contention in regards to that claim. Pl. Resp. at 1, ECF 87. Moreover, the parties' Joint Statement indicated that the parties had agreed that "uniformly-sized" meant "the same size." Joint Statement at 3. Accordingly, further construction by the Court as to that term is not necessary.

e.  'D093 Patent

The parties also ask the Court to construe the 'D093 design patent by providing a "detailed verbal description of the claimed design." Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665, 679 (Fed. Cir. 2008). Columbia offers the following construction:

A repeating pattern of adjacent wavy lines of contrasting colors on a material designed to reflect heat, without regard to (i) any trade names or logos in the pattern, (ii) orientation of the pattern, and (iii) the choices of the colors used.

Joint Statement at 5. Seirus offers the following construction:

The ornamental aspects of an uninterrupted pattern of wave shaped elements as shown and described.

Id.

The Court declines to construe the 'D093 patent with a detailed verbal description. "As the Supreme Court has recognized, a design is better represented by an illustration 'than it could be by any description and a description would probably not be intelligible without the illustration.' " Egyptian Goddess , 543 F.3d at 679 (quoting Dobson v. Dornan, 118 U.S. 10, 14 (1886)). "Given the recognized difficulties entailed in trying to describe a design in words, the preferable course ordinarily will be for a district court not to attempt to 'construe' a design patent claim by providing a detailed verbal description of the claimed design." Id. The Court here follows that preferable course.

As the parties well know, Columbia has filed a motion for partial summary judgment regarding the 'D093 patent. Pl. Motion for Partial Summary Judgement, ECF 75. In resolving that motion, the Court will explore the legal rules underlying the parties' proposed constructions of the 'D093 patent. Rather than analyzing the parties' summary judgment arguments into this claim construction Opinion & Order, the Court will address those issues in a separate Opinion & Order and incorporate the analysis of the proper scope of the 'D093 patent into jury instructions.

//

//

//

//

//

//

//

OPINION & ORDER - 17

CONCLUSION

The Court construes the contested terms as stated.


IT IS SO ORDERED

Dated this _____ day of _____, 2016.


MARCO A. HERNÁNDEZ
United States District Judge